George Fuller GREEN and Nina King Green, Plaintiffs,

v.

E. O. BOOKWALTER, District Director of Internal Revenue, Defendant.

No. 12831.

United States District Court
W. D. Missouri, W. D.

Aug. 9, 1962.

Lancie L. Watts, Marvin C. Hopper, Charles C. Shafer, Jr., Kansas City, Mo., for plaintiffs.

F. Russell Millin, U. S. Dist. Atty., John Harry Wiggins, Asst. U. S. Dist. Atty., Kansas City, Mo., for defendant.

JOHN W. OLIVER, District Judge.

This is an action to recover a refund for taxes paid for the year 1956. The Commissioner of Internal Revenue disallowed deductions claimed by plaintiff for travel expenses in connection with two separate trips. Plaintiff contends that

travel expenses in the amount of $1,645.-77 incurred by him on a South American trip as a Commissioner of the Commission for International Relations and Trade of Kansas City, Missouri, were deductible on the theory that plaintiff was then performing the functions of a public office within the meaning of § 7701(a) (26) IRC 1954, 26 U.S.C.A. § 7701(a) (26),[1] and that those expenditures were expenses of a trade or business within the meaning of § 162 IRC, 1954.[2] A like contention is made in connection with $369.25 expended by plaintiff for travel expenses as a Commissioner of the Park Board of Kansas City, Missouri, for another trip made in the United States and Canada during the year 1956.

Plaintiff, in the alternative, contends that the travel expenses of both trips were deductible because, in both instances, plaintiff was performing the functions of a public office within the meaning of § 7701(a) (26) IRC, 1954, and that the travel expenses should therefore be considered as a charitable contribution under § 170(c) (1), 170(c) (2), and 501(c) (6), IRC, 1954.[3]

1. "§ 7701. Definitions.
"(a) When used in this title, where not otherwise distinctly expressed or manifestly incompatible with the intent thereof—
* * * * *
"(26) Trade or business.—The term 'trade or business' includes the performance of the functions of a public office."

2. "§ 162. Trade or business expenses.
"(a) *In general.*—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including—
* * * * *
"(2) traveling expenses (including the entire amount expended for meals and lodging) while away from home in the pursuit of a trade or business; * * *.

3. "§ 170. Charitable, etc., contributions and gifts.
* * * * *
"(c) *Charitable contribution defined.*—For purposes of this section, the term 'charitable contribution' means a contribution or gift to or for the use of—
"(1) A State, a Territory, a possession of the United States, or any political

subdivision of any of the foregoing, or the United States or the District of Columbia, but only if the contribution or gift is made for exclusively public purposes.
"(2) A corporation, trust, or community chest, fund, or foundation—
"(A) created or organized in the United States or in any possession thereof, or under the law of the United States, any State or Territory, the District of Columbia, or any possession of the United States;
"(B) organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes or for the prevention of cruelty to children or animals;
"(C) no part of the net earnings of which inures to the benefit of any private shareholder or individual; and
"(D) no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation.
A contribution or gift by a corporation to a trust, chest, fund, or foundation shall be deductible by reason of this paragraph only if it is to be used within the United States or any of its possessions

The facts in regard to both trips are not in substantial dispute. On November 10, 1955, the City Council of Kansas City, Missouri, passed Resolution #19745 which authorized the Mayor to appoint a Kansas City Commission for International Relations and Trade. That resolution provided:

"WHEREAS, for the purpose of fostering good will in the Americas and strengthening hemispheric solidarity, particularly between Kansas City, Missouri, its metropolitan area, and our Latin American neighbor republics to the south, and

"WHEREAS, Kansas City and its metropolitan area are located in the Heart of the United States and have extensive river and rail facilities for export and import volume, which should stimulate trade with said republics, and have a diversified business and industry structure which is engaged in foreign trade, NOW, THEREFORE,

"BE IT RESOLVED BY THE COUNCIL OF KANSAS CITY:

"That the Mayor be authorized to appoint a Commission of thirty (30) members, including himself, from Kansas City and its metropolitan area to be known as the Kansas City Commission for International Relations and Trade, who shall serve for a period of three years, without compensation, and carry on their work at their own expense. Said Commission shall be authorized to represent Kansas City and its metropolitan area for the purpose of acquainting the Latin American countries with this area's trade opportunities, economic development, and cultural life, and to develop better understanding among the people of the Greater Kansas City community of the economic potentialities and the cultural and social life of the countries of Latin America.

"Said Commission shall work in conjunction with, and support of, other existing foreign trade groups and associations."

Plaintiff was appointed a Commissioner and as such in the year 1956 visited Caracas, Venezuela; Rio De Janeiro, Brazil; Sao Paulo, Brazil; Montevideo, Uruguay; Buenos Aires, Argentina; Santiago, Chile; Lima, Peru; Panama City, Panama; and Mexico City.

As a member and at the direction of the Park Board, plaintiff attended the annual convention of the American Institute of Park Executives, held in Seattle, Washington in 1956. En route, plaintiff, on his own initiative, visited the Canadian parks of Banff, Lake Louise and the Canadian Gardens at Vancouver and Victoria. After the close of the convention plaintiff, also on his own initiative, visited the International Rose Gardens at Portland, Oregon, Mt. Ranier National Park in Washington, Sun Valley in Idaho, and the City Park and Zoo in Denver, Colorado before returning to Kansas City. The Park Board reimbursed plaintiff in the amount of $354.80 to cover his expenses directly involved with the Seattle convention. The unreimbursed sum of $369.25 represents plaintiff's claim in regard to travel and other expenses for his visits to places other than the convention city.

The parties stipulated that the following issues are for decision:

"1. Whether or not the Resolution had the effect of creating a 'public office' within the meaning of § 7701(a) (26), IRC, 1954.

exclusively for purposes specified in subparagraph (B)."

"§ 501. Exemption from tax on corporations, certain trusts, etc.

\* \* \* \* \*

"(c) *List of exempt organizations.—* The following organizations are referred to in subsection (a):

\* \* \* \* \*

"(6) Business leagues, chambers of commerce, real-estate boards, or boards of trade, not organized for profit and no part of the net earnings of which inures to the benefit of any private shareholder or individual."

"2. Whether or not, in the performance of his functions as a Commissioner of the Commission for International Relations and Trade of Kansas City, Missouri, plaintiff, George Fuller Green, in making the trip to South America, was performing the 'functions of a public office' within the meaning of § 7701(a) (26), IRC, 1954.

"3. If said plaintiff was performing the functions of a public office, were the expenses claimed deductible as travelling expenses under § 162, of the 1954 IRC?

"4. If said plaintiff was performing the functions of a public office, were the expenses claimed deductible as a charitable contribution under § 170, 1954 IRC?

"5. Were the expenses incurred by the plaintiff on his trip to Seattle, Washington, incurred in connection with the performance of his duties as a member of the Kansas City Park Board, or were they non-deductible business expenses?"

We look first to the South American trip. In regard to those expenses, defendant argues that the Commissioner properly disallowed the claimed deduction because "the Latin American expedition was not an official undertaking, but a voluntary, private venture which, at best, had the sanction of the City and that absent a showing of a direct business purpose for taking the trip (outside the 'public office' theory), the expenses are not deductible as business expenses under § 162 of the 1954 Code." In regard to the charitable contribution theory, defendant argues that "the travel expense was incurred solely on behalf of the Commission, which is not a 'state * * * or any political subdivision * * * thereof' as required by § 170(c) (1); or an association 'organized and operated exclusively for * * * charitable * * or educational purposes * * *' as required by § 170(c) (2); nor were the expenditures incurred exclusively for public or other charitable purposes".[4]

Basically, defendant argues that a Commissioner appointed pursuant to the Resolution of the Council did not occupy a "public office" within the meaning of the statute. Defendant contends that the Resolution was but an "honorary endorsement of the City Council". Defendant suggests that the legal status of a Commissioner of the Kansas City Commission for International Relations and Trade is not dissimilar to the status of a Colonel on the staff of the Governor of Missouri,[5] or a similar office well known in the State of Kentucky, or officers in the respective Navies of the States of Nebraska and Texas.

In regard to plaintiff's charitable deduction theory, defendant argues that "the express purpose of the Commission was to stimulate trade; the promotion of trade may be good business but it is not charity". On this point, defendant relies chiefly on the rationale of Better Business Bureau v. United States, 326 U.S. 279, 66 S.Ct. 112, 90 L.Ed. 67 (1945).

Plaintiff counters with the argument that defendant cannot "collaterally attack the legality or existence of the office of Commissioner"; and that defendant cannot inquire into "the motive and intent of the members of the City Council" in passing the resolution creating the Com-

4. Defendant made clear that his resistance to the taxpayer's claimed deductions was not an attack on the merit of the Commission, its members, or its activities. Defendant conceded that to the extent the Commission and its members strengthened ties with Latin American countries they were to be "highly commended". On the other hand, defendant directs attention to the principle stated in Estate of Blaine v. Commissioner, 22 T.C. 1195, 1212, which held that "the question in any particular case is neither whether the organization is worthy, nor whether it is engaged in desirable activities, but it is whether the particular matter under review is covered by the specific statutory provision relating thereto".

5. The record does not show whether or not some of the Commissioners were also Colonels on the staff of the Governor of Missouri.

mission; that the City Council enacted the resolution consistent with the public purpose of developing markets for the products of the State of Missouri and that in carrying out that public policy the Commissioners were public officers engaged in a trade or business and therefore entitled to deduct their travel expenses. Plaintiff relies on Revenue Ruling 59–160, CB 1959–1, 59, to support his charitable deduction theory.

We state first the factual background.

Hal Hendrix, a former reporter for the Kansas City Star, had a long continuing interest in Latin America. While covering the Tenth Inter American Conference at Caracas for the Star, he met the then Assistant Secretary of State, Henry F. Holland. Mr. Holland was assigned to the Inter American Affairs Division of the State Department. He indicated that if Mr. Hendrix was able to organize a delegation of professional, business and industrial leaders from Kansas City to visit Latin America, he would be happy to have the State Department lend its assistance to such an undertaking. Mr. Hendrix, by his own statement, "didn't know how to get the right group of people together". He also stated that: "I knew that unless we had the right people involved in such a project, that something like this could be just another pleasure junket with the members of the delegation interested only in sightseeing in the best bars". Mr. Hendrix discussed his idea with Mr. Roy Roberts of the Kansas City Star. Mr. Roberts thought it a good idea. Mr. Hendrix then approached the Honorable H. Roe Bartle, the then newly elected Mayor of Kansas City, Missouri. Mayor Bartle was enthusiastic.

In August, 1955, Mayor Bartle arranged a luncheon and invited thirty Kansas Citians to attend to hear Mr. Hendrix' idea. After the luncheon Mr. Holland was advised by Mr. Hendrix that excellent progress was being made. Mr. Holland, in turn, wrote Mr. Hendrix: "Please be assured that the State Department will be prepared to assist in every appropriate way to make this undertaking worthwhile and useful to those participating in it". Mr. Holland added: "Should the group find it possible to visit Washington before their departure, I will welcome an opportunity to talk with them and to arrange for them to meet with others who could give them information which may be useful to them on their trip".[6]

Before the City Council had any knowledge of the proposed trip, Mayor Bartle forwarded various memoranda to the "Official Kansas City Delegation" on the subject of "Kansas City Operation South America".

On October 15, 1955, and still before any Council action, Mr. Charles Shafer, a lawyer and a member of the City Council who also made the trip, wrote Mayor Bartle that he had "volunteered to do some research on the deductibility of expenses paid on the South American promotional trip suggested and planned by you". Mr. Shafer pointed out that there was no precedent for the contemplated expense and suggested that business men with direct business or financial interests in one or more of the South American countries to be visited would have no difficulty in sustaining the deductions. He stated that this category "is the only group we feel positively can deduct their expenses".

Mr. Shafer's letter continued by stating, "however, we have a suggested procedure which we believe will insure the deduction for all categories". After citation of § 162(a) (2) and 7701(a) (26), and the citation of several of the authorities now called to the attention of the Court, Mr. Shafer stated that "it should

6. With the help of the State Department, plans were eventually worked out for briefings of the delegation by officials of the State, Treasury and Commerce Departments, the Import-Export Bank, and by the Pan-American Union. Those briefings were held on February 2, 1956, the first day of the trip. The State Department agreed to and did alert the various Embassies along the route to be traveled.

be apparent that our suggestion is to appoint the men involved to public office". Concretely, Mr. Shafer suggested that an ordinance be introduced setting up a Commission and that Commissioners should receive definite appointment, serve without compensation and to undertake such missions as may be "assigned from time to time" by the Mayor or the City Council.[7] Mr. Shafer closed his letter by expressing the thought that the outlined suggestions, if followed, "should successfully stop * * * the Bureau's attack". A copy of Mr. Shafer's opinion was furnished each prospective member of the delegation.

The City Council passed its resolution November 10, 1955. Mayor Bartle's memorandum of December 28, 1955, the first issued after the passage of the resolution, was addressed to the "Members of the Kansas City Commission for International Relations and Trade" rather than to the "Official Kansas City Delegation", as all earlier memoranda had been addressed.[8] In that memorandum, the question of the possible tax deductibility of the expenses of the members was mentioned for the first time. Referring to a meeting held the day before, that memorandum stated:

"For the record, the Commission * * decided that each member should send to Mr. Forrest Byers, our able Executive Secretary, a check in the amount of $2,-000, payable to the Kansas City Commission for International Relations and Trade, which would become an income tax deductible item for business expense".

The trip was taken. Upon the return of the Commission to Kansas City, no written report of its activities was made to the City of Kansas City, Missouri. A 14 page printed document, however, entitled "Report of the Kansas City Commission for International Relations and Trade—Latin American Fact-Finding Trip, February, 1956" was prepared. That report of "impressions, observations and suggestions" was quite general in nature and concluded with twenty specific recommendations "to the United States Government".[9]

7. A second trip, not involved in this litigation, was made by the Commission in 1957. Cuba, the Dominican Republic, Haiti, Guatemala, Trinidad and Puerto Rico were visited on that trip. No other trips have been taken, according to the Mayor's testimony, "primarily because of the point of view of the Government". The Mayor explained that he was referring "to the question as to whether the expenses are deductible for income tax purposes". The Mayor testified that another trip was "already projected and ready to plan awaiting the outcome of the trial in this particular case". A 1957 South American trip by thirty Kansas City women traveling under the name of "Women's Kansas City Commission for International Relations and Trade" was apparently unconnected with the Commission of which plaintiff was a member.

8. The record is not clear exactly when the exact personnel was finally determined. In urging the passage of the Resolution, Mayor Bartle advised the City Council that eight specifically named persons "have agreed at their own expense, to make a pilgrimage from Kansas City to South America". None of the then named persons actually made the trip.

Neither is the record clear as to when plaintiff actually agreed to go. His name was not on the list of the original thirty Kansas Citians originally contacted (of whom ten actually went) nor was he one of those named by the Mayor at the November Council meeting. It is, of course, clear that he was "officially appointed" as of January 23, 1956.

9. The first page of the Report emphasized that each member of the Commission "paid all his individual expenses" for the 24-day trip * * * Even though the Commission is now a duly organized unit of the municipal government of the City of Kansas City, Missouri, there was no expenditure of taxpayers' funds for any phase of our mission". Resolution of the conflict between that statement and other evidence in this case to the effect that an office in the City Hall was assigned for the free use of the Commission; the evidence that the City paid for the stationary, letters, and postage sent the prospective members before the City had taken any action creating the Commission; and the evidence that the taxpayers of Kansas City paid for printed pamphlets and for the keys to the City and the Distinguished Service medals distributed to various people in South Ameri-

At a meeting in Mexico City near the end of the trip, the members of the Commission became interested in sponsoring scholarships for Latin American students to the United States. Some thought was also given to the establishment of a trade fair for Kansas City and the establishment of Kansas City as a port of entry between the United States and South American countries.

■ In order to facilitate the accomplishment of those objectives, the "Kansas City Association for International Relations and Trade" was incorporated by pro forma decree in the Circuit Court of Jackson County, Missouri, on June 5, 1956. The corporate members of the newly incorporated Association included all persons appointed by the Mayor as members of the Commission. The by-laws of the Association provided that its officers were to be the officers who had been appointed to serve the Commission. The Mayor testified that he would "concur that, in all probability, the Commission has, basically, the same idea as the Association". When the Association filed its Form 1024, seeking exemption from federal income taxes, it indicated on that form that it belonged in the "business league, chamber of commerce, etc." category of § 501(c) (6). The Association also stated in filing that form that it was "the outgrowth or continuation" of the Commission, thus claiming that its existence as a "business league, chamber of commerce, etc." dated from the date the Commission was appointed pursuant to the resolution. Of course, what the Association stated about the Commission cannot bind the Commission, but it must be remembered that all the officers and all the members of the Commission were in fact officers and members of the Association. This evidence, while not controlling, is nevertheless significant. It is to be further noted that exemption from federal income taxes was eventually granted the Association pursuant to the provisions of § 501(c) (6).

■ Both sides cite and rely upon portions of Rev.Rule 55–109, Cumulative Bulletin 1955–1, 261. It was there determined that certain non-reimbursed travel expenses of members of the Armed Forces Reserve were deductible as business expenses. It was also there correctly stated that what is now § 7701(a) (26) "was declaratory of existing law". See McDonald v. Commissioner, 323 U.S. 57, 62, 65 S.Ct. 96, 89 L.Ed. 68 (1944). We also agree that § 7701(a) (26) cannot be construed as "automatically converting into a trade or business the functions of every so-called 'public office' performed by a volunteer." We likewise believe, as stated there, "that the functions of a public office which are in the nature of a trade or business should be treated as such, even though the incumbent thereof may serve without compensation * * ". But such a determination does not mean that the travel expenses of all unpaid offices are deductible. The parties recognized that there are "public offices" of different sorts when they stipulated that the issue for decision was "whether or not the Resolution had the effect of creating a 'public office' within the meaning of § 7701(a) (26), IRC, 1954".

The meaning of the words "public office" or "public officer" within the meaning of a taxing power is not a new legal problem. Before the Supreme Court re-examined the basic rationale of Collector v. Day, 11 Wall. 113, 20 L.Ed. 122 (1870), courts were not infrequently required to determine whether particular State public officers were or were not exercising the type of state or city governmental function that would exempt their incomes from taxation by the Federal Government. Chief Justice Hughes, in Helvering v. Powers, 293 U.S. 214, 224, 55 S.Ct. 171, 79 L.Ed. 291 (1934) held that the question of whether Congress could im-

---

ca, is not necessary for the decision of this case. The latter evidence does not require a finding that the Commissioners were "public officers" of Kansas City, as

contended by plaintiff. Nor does the former evidence have any real impact on the ultimate factual determination of this case.

pose a tax on the compensation of certain public officers could not be "answered by mere terminology". That case held in language applicable to this case that:

"The term 'public office' undoubtedly implies a definite assignment of public activity, fixed by appointment, tenure and duties. But whether that field of activity, in relation to a State, carries immunity from federal taxation is a question which compels consideration of the nature of the activity, apart from the mere creation of offices for conducting it, and of the fundamental reason for denying federal authority to tax."

In Metcalf & Eddy v. Mitchell, 269 U.S. 514, 522, 523, 46 S.Ct. 172, 70 L.Ed. 384, (1926), Mr. Justice Stone called attention to the problem of drawing a line between the cases where particular "public officers" of a State "immediately and directly exercises its sovereign powers" and the cases at "the other end of the scale" where there was merely some connection with state or city government. "Experience has shown", it was there held, "that there is no formula by which that line may be plotted with precision in advance". Brush v. Commissioner, 300 U.S. 352, 360, 361, 365, 366, 57 S.Ct. 495, 81 L.Ed. 691 (1936), suggested the test of whether the income of the city employees there involved was exempt was dependent upon the question of whether the office "was created and is conducted in the exercise of the city's governmental functions". That case further noted that "the phrase 'governmental functions,' * * * has been qualified * * in a variety of ways". The court noted that the adjectives "strictly", "essential", and "usual" had been used in various earlier cases to describe the particular sort of "governmental function" involved. Like Metcalf & Eddy, the Supreme Court in Brush held that "the issue cannot be decided in accordance with the established formula" but that "the cases must be put upon one side or the other of the line by * * * the gradual process of

historical and judicial 'inclusion and exclusion.' "

The cases are in quite general accord as to the requisite elements that define a public office. There is no conflict between the law of Missouri and that of the United States. Pope v. Commissioner, (6 Cir., 1943) 138 F.2d 1006, 1009, for example, in a case involving the taxability of the income of a public office created by the State of Tennessee, held:

"Giving the word 'office' the sovereignty of the state attaches for its technical qualities, five elements would seem indispensible in order to make a public office of a civil nature. (1) It must be created by the Constitution or the Legislature, or by a municipality or other body with authority conferred by the Legislature. (2) There must be a delegation of a portion of the sovereign powers of government to be exercised for the benefit of the public. (3) The powers conferred and the duties to be discharged must be defined either directly or indirectly by the Legislature or through legislative authority. (4) The duties must be performed independently and without control of a superior power other than the law. (5) The office must have some permanency and continuity and the officer must take an official oath."

Mechem's definition was adopted as a rule of decision by the Supreme Court of Missouri, en Banc, in State ex rel. Pickett v. Truman, 333 Mo. 1018, 1022, 64 S.W.2d 105, 106 (1933):

"A public office is the right, authority and duty, created and conferred by law, by which for a given period, either fixed by law or enduring at the pleasure of the creating power, an individual is invested with some portion of the sovereign functions of the government, to be exercised by him for the benefit of the public. The individual so invested is a public officer."

That case, as do others in Missouri, accepted and adopted language from the

fff.ff me

Supreme Court of Ohio, State ex rel. Landis v. Board of Commissioners of Butler County, 95 Ohio St. 157, 115 N.E. 919, in determining that to constitute a public office "it is essential that certain independent public duties, a part of the sovereignty of the state, should be appointed to it by law". And, in order to illustrate what was meant by the words "a part of sovereignty", the Supreme Court of Missouri adopted the following from the Ohio decision:

> "'If specific statutory and independent duties are imposed upon an appointee in relation to the exercise of the police powers of the State, if the appointee is invested with independent power in the disposition of public property or with power to incur financial obligations upon the part of the county or state, if he is empowered to act in those multitudinous cases involving business or political dealings between individuals and the public, wherein the latter must necessarily act through an official agency, then such functions are a part of the sovereignty of the state.'"

Again, in State ex inf. McKittrick v. Bode, 342 Mo. 162, 165, 113 S.W.2d 805, 806 (1938), the Supreme Court of Missouri en Banc held that "a delegation of some part of the sovereign power is an important matter to be considered". And in State ex rel. Webb v. Pigg, 363 Mo. 133, 138, 142, 249 S.W.2d 435, 438, 441 (1952), the Supreme Court of Missouri en Banc noted the necessity of delegation of "a portion of the sovereign power of government". That case also held that "in considering the meaning of the term 'sovereign power', and as illustrative thereof, this court has repeatedly quoted from the case of State ex rel. Landis v. Board of Commissioners of Butler County, 95 Ohio St. 157, 115 N.E. 919, 920 [1917]," thereafter quoting the portion of the Ohio opinion above quoted. Whether any "portion of the sovereign functions of government" has in fact been delegated, the Supreme Court of Missouri held in Pigg "can be ascertained only by a careful review of the applicable statutory and constitutional provisions"

Any review of the delegation of sovereign municipal power by the City of Kansas City, Missouri, to the Kansas City Commission of International Relations and Trade must be realistic. Talk about collateral attacks upon the legality of a public office is beside the point. The question is not whether some sort of public office was created. The question is what sort of an office was created. And, of course, ultimately, whether that office was the sort of public office the Congress intended to permit deductions. In a quite broad sense, the Supreme Court dealt with a not dissimilar problem in State of Oklahoma ex rel. Johnson v. Cook, 304 U.S. 387, 393, 396, 394, 58 S.Ct. 954, 82 L.Ed. 1416 (1938). In that case the Commissioner of Banking of Oklahoma attempted to invoke the original jurisdiction of that court. Article III, § 2, Clause 2 of the Constitution confers original jurisdiction on the Supreme Court "in all Cases * * * in which a State shall be Party". By statute and by rule of decision of Oklahoma, it was clear that the State of Oklahoma was properly a "party" in cases brought under the particular statutes involved. But the Supreme Court in denying jurisdiction, held that there were "parties" and there were "parties" just as in this case, there are "public offices" and there are "public offices". The Supreme Court held that in order to determine what sort of a "party" was involved, it "must look beyond the mere legal title of the complaining State * * * and to the nature of the State's interest". Before jurisdiction could be said to be present "the State must show a direct interest of its own and not merely seek recovery for the benefit of individuals who are the real parties in interest". The necessary interest of the State must be demonstrated to be a sovereign interest and resort to the original jurisdiction of the Supreme Court could not be had where the cause of action asserted was "in the name of the State but in reality for the benefit of particular individ-

uals, albeit the State asserts an economic interest in the claims and declares their enforcement to be a matter of state policy". The mere acquisition by a State of "legal title to a cause of action" was held to be not enough.

A like and quite basic application of concepts of sovereignty underlie the principles that control the decision of this case. The definitions we have stated in regard to a truly "public office" all include references to the prerequisite of a delegation of "the sovereign power of government" (from Pope v. Commissioner, supra), or the investment of an individual "with some portion of the sovereign functions of the government, to be exercised by him for the benefit of the public" (from State ex rel. Pickett v. Truman, supra). But, as emphatically pointed out in Pigg, supra, when one studies the cases relating to public officers "there is *little or no discussion of the nature of the sovereign power exercised* by the officials involved" (emphasis by the Supreme Court of Missouri). We think this is true because, as noted in Brush, a particular court is "quite able to say that certain functions exercised by a city are clearly governmental—that is, lie upon the nearer side of the line— while others are just as clearly private or corporate in character, and lie upon the farther side". The "zone of debatable ground" is a quite narrow one and the occasion to discuss the nature of the sovereign power actually delegated or exercised does not frequently arise—and hence is not the subject of discussion.[10]

This case is a good example of the narrowness of the zone of debatable ground. When the facts are viewed realistically it becomes apparent that the City Council of Kansas City, Missouri, did not intend, nor did it delegate any of its sovereign power to the Kansas City Commission on International Relations and Trade. Assuming without deciding that any Commission could legally be established by resolution rather than by ordinance,[11] it is clear that the resolution merely authorized the Mayor "to appoint a Commission of thirty (30) members, including himself, from Kansas City and its metropolitan area,[12] * * * to carry on their work at their own expense". "Their work" was never definitely stated. The Commission was authorized generally "to represent Kansas City and its metropolitan area for the purpose of acquainting the Latin American countries with this area's trade opportunities, economic development, and cultural life, and to develop better understanding among the people of the Greater Kansas City community of the economic potentialities and the cultural and social life of the countries of Latin America". The Commission was also directed generally to "work in conjunction with, and support of, other existing foreign trade groups and associations".

10. The Treasury Department rulings involving Dollar a Year men, N.R.A. officials and members of State legislatures; and tax court decisions involving various employees of the Federal government cited by plaintiff are not helpful because they all involve factual situations quite unlike the facts of this case. The legal principles, of course, are applicable but those principles must be applied to facts established by the evidence in this case.

11. There is real doubt as to whether the assumption is a valid one. See City of Jackson v. Houck, 226 Mo.App., 835, 43 S.W.2d 908 (1931) and cases cited therein.

12. It is stipulated that five members of the Commission resided in Johnson County, Kansas. Article VII, § 8 of the Missouri Constitution, V.A.M.S., provides that "no person shall be * * * appointed to any civil or military office in this state who is not a citizen of the United States, and who shall not have resided in this state one year next preceding his election or appointment, except that the residence in this state shall not be necessary in cases of appointment to administrative positions requiring technical or specialized skill or knowledge". Kirby v. Nolte, en Banc, 349 Mo. 1015, 164 S.W. 2d 1 (1942), held that a former similar provision of the 1875 Missouri Constitution meant exactly what it said. There is no claim that the exception to residence was applicable to the persons appointed.

State ex rel. Pickett v. Truman, supra, 333 Mo. at 1021, 64 S.W.2d at 106 suggests that one of the criteria for judging the existence of a public office is whether there were "definite duties imposed by law involving the exercise of some portion of the sovereign power". We do not think that test was satisfied by the language of the resolution.

But quite apart from any black letter matching of particular portions of the evidence against the specific language of the definitions stated in the cited cases, we believe that it is clear from all the evidence that the idea of giving the trip some sort of an official blessing by the passage of the resolution did not occur until well after the general pattern of what both Mr. Hendrix and Mayor Bartle referred to as the "pilgrimage" was well established. There can be no doubt that the efforts of those two men and the others who became involved were successful in preventing the trip from being a "pleasure junket * * * interested only in sight-seeing in the best bars", to borrow Mr. Hendrix' words, but the accomplishment of that end does not mean that the resolution created a "public office" within the meaning of the taxing statutes.

Our determination that the sort of public office contemplated by the taxing statute was not created is predicated on our finding that the City's resolution made no real delegation of its power to transact the public's business nor did it empower the Commissioners with any real authority to exercise the sovereign power of Kansas City. In making that finding we are mindful of the fact that we are passing on a declaration of the City Council of Kansas City, Missouri, that objectively stated that it intended to create a public office. We do not challenge the existence of that public office. We hold that whatever sort of office that may have been intended by the resolution was and is not the sort of public office

contemplated by the Congress when it codified the existing law by its enactment of § 7701(a) (26).

We cannot be unmindful of that Congressional intent nor can we disregard the consequences of a decision approving the municipal procedure followed in this case. In State of Oklahoma ex rel. Johnson v. Cook, supra, Mr. Chief Justice Hughes noted that "[I]f the contention of the State were accepted * * * and if, by the simple expedient of providing that the title (to causes of action) should vest in the State and that suits * * * be prosecuted in the name of the State, resort to our original jurisdiction were permitted, the enormous burden which would thereby be imposed upon this Court can readily be imagined". One can also readily imagine the number of trips that would be taken by all sorts of municipal resolution-approved commissions if the members of a contemplated trip could, by what in any number of communities in the United States would be a simple expedient, get the governing bodies of those communities to pass a resolution authorizing and approving their appointment for any number of worthwhile—and, perhaps some not quite so worthwhile—purposes. The invitation to expense deductible travel would not stop there. If a city could thus create a "public office" within the meaning of the taxing statute, then, for further example, the members of the honorary staff of the Governor of Missouri, appointed pursuant to Section 41.-130, RSMo 1959, V.A.M.S., "with the brevet title of military colonel or naval captain, as he may desire," [13] would be entitled to deduct their travel expenses for trips that presently existing group might decide to make to acquaint themselves with the military (or naval) installations in Hawaii, and other points of interest determined by them.

■ Our decision on the public office branch of this case forecasts our decision

13. The Court does not know of any naval captains that have been appointed by any Missouri Governor. In fact, until this case came before it, this Court did not know the Governor of Missouri had power to appoint a naval captain to his honorary staff.

on the charitable contribution branch. Section 170(c) defines a charitable contribution as one made to or for the use of "(1) A State * * * or any political subdivision [thereof] * * *, but only if the contribution or gift is made for exclusively public purposes". Under the facts as we have found them, Better Business Bureau v. United States, 326 U.S. 279, 280, 283, 66 S.Ct. 112, 90 L.Ed. 67 (1945), is controlling. While that case involved a claim of exemption from social security taxes on the theory the Better Business Bureau of Washington, D.C. was operated "exclusively for scientific or educational purposes" within the meaning of the Social Security Act, the rationale of that case is applicable to this case. The Supreme Court there pointed out that a single substantial non-educational purpose would destroy the exclusiveness of purpose which was the statutory prerequisite for claiming exemption. It was apparent beyond dispute in that case, as in this, "that an important, if not the primary, pursuit of petitioner's organization is to promote not only an ethical but also a profitable business community". That case held that "the exemption is therefore unavailable to petitioner".[14]

In Better Business Bureau, The Supreme Court took note of the fact that the Washington, D. C. Better Business Bureau had claimed and was granted an exemption from income taxes under the "business leagues, chambers of commerce, etc." exemption provision. We have indicated our belief that it is significant in this case that the Kansas City *Association* for International Relations and Trade claimed and was granted a like

exemption based upon its representation that the Commission was its predecessor and that the date of the organization of the Commission was the date to be taken as the date of the organization of the Association. We do not find that the circumstances stated in connection with the exemption are controlling, but we do find them to be significant in our appraisal of all of the facts.

The factual situation as we find it requires that we hold that deduction cannot be claimed under § 170(c) because plaintiff's contribution cannot be said to have been made "exclusively for public purposes".

It should perhaps be added that the decision in this case in regard to plaintiff's South American trip is quite a narrow one. The determination that plaintiff is not entitled to deduct his travel expenses on the theory that he was a public officer does not determine that other persons who made the trip may not have a perfect right to deduct their travel expenses under other provisions of the taxing laws. Those cases, of course, are not before the Court. The Court does not rule them. We point out, however, that the deductibility of the expenses of each member of the Commission rests upon its own factual basis and that this case is in no way a mass determination that the travel expenses of all members of the Commission are not deductible. Plaintiff established no other basis of exemption, hence his claim must fail.

There remains only the question of whether plaintiff should recover the travel expenses unreimbursed by the Park Board.

14. The Supreme Court noted that the purposes of the Better Business Bureau were "highly commendable" but that they were "directed fundamentally to ends other than that of education". Plaintiff's argument that "it is difficult for the professional and business men who made this trip as representatives of Kansas City to understand why their right to deduct these expenses has been challenged by the Internal Revenue Service" is answered by the fact that the Internal Revenue Service, like this Court, must administer the law as written by Congress. Private views cannot control either administrative or judicial decisions. As recently as April 30, 1962, the Supreme Court has reiterated that "equitable considerations * * * are of course beside the point * * * since we must give the statute effect in accordance with the purpose so clearly manifested by Congress", Commissioner of Internal Revenue v. Bilder, 369 U.S. 499, 504, 82 S.Ct. 881, 8 L.Ed.2d 65 (1962).

The Park Department of Kansas City was created by § 50 of Article III of the Charter of Kansas City. It is there provided that the Board of Park Commissioners shall manage and control that department. The Charter of Kansas City created the sort of public office intended by Congress when it enacted § 7701(a) (26). The public office of a member of the Park Board is as clearly on one side of the line as the office of a Commissioner of the Commission for International Relations and Trade is on the other. We therefore reach the question of whether the unreimbursed expenses of plaintiff as a member of the Park Board were deductible as ordinary and necessary expenses paid by plaintiff while away from home in the performance of the functions of a public office.

4 Mertens, The Law of Federal Income Taxation, § 25.99, at 285–86, (revised ed. 1960), states that "the general rule that personal expenditures are not deductible as business expenses applies, of course, to traveling expenses". It is there further stated that "each case will, naturally, turn on its own facts and there is no ready yardstick rule of thumb for determining which traveling expenses are personal and which are incurred in the pursuit of a trade or business". Patterson v. Thomas, (5th Cir., 1961) 289 F.2d 108, 114, likewise holds that "whether an expenditure is ordinary and necessary to a taxpayer's trade or business is usually a question of fact".

Plaintiff testified that his visits to the Canadian parks of Banff, Lake Louise, and the Canadian Gardens of Vancouver and Victoria and his visits to the International Rose Gardens at Portland, Oregon; Mt. Ranier, Washington; Sun Valley, Idaho; and Denver, Colorado, were made "because of their park significance", and because he thought his "observations would be of benefit to the Park Department in showing them what they are doing in other parts of the country and Canada". There can be no doubt that this would be true but this would not necessarily establish that the expenses should be deductible. Busmen are not the only persons who take a particular type of holiday.

Plaintiff took pictures of what he saw and upon his return to Kansas City showed those pictures "to the Park Commissioners, the superintendent, the assistant superintendent, the forester, the florist, and Cully, superintendent of the Zoo". Nor is that fact conclusive. Many persons show their vacation pictures to their friends and associates.

On the other side of the ledger, plaintiff testified that he was not "directed by the Park Board to visit the places that (he) did visit en route to and from Seattle"; that he was not "required to * * * make these other trips to the various places that (he) visited going to and from Seattle"; that there was "no direct authorization" to take the pictures; and that while he had shown the pictures at a dinner given all members of the Park Department he believed that the pictures were his personal property and did not belong to Kansas City because "they never paid me for them, anything on them".

Plaintiff made a trip in July, 1956, to visit a daughter and her husband who lived in Denver. While in Denver he visited the Royal Gorge, the Denver City Park, and a resort called "The North Pole". He visited the latter "not with any idea that the Park Department told him to do so" but because he desired to get ideas and because the Kansas City Park Department placed emphasis upon its children's zoo. On this trip, the expenses of which were not reimbursed by the Park Department and for which plaintiff made no claim of tax deduction, he also took pictures which he showed to other members of the Park Board upon his return to Kansas City.

The burden of proof for establishing the deductibility rests upon plaintiff. Defendant does not dispute "that the trip to Seattle was an official trip, and we have not challenged the amount of expenditure which we felt was pertinent to the trip to Seattle and back". Defendant does question whether plaintiff was "on duty for the city" at any

time other than actual attendance at the meeting of the American Institute of Park Executives in Seattle.

We cannot find that plaintiff has carried the burden of showing that the travel expenses in dispute were reasonable and necessary for the conduct of the plaintiff's business as a member of the Park Board. Plaintiff, of course, must be commended for the interest he demonstrated in acquiring additional information and knowledge concerning the parks, gardens and zoos of other cities. But again, the Court is forced to find on plaintiff's own testimony that the trips to places other than Seattle were primarily personal in nature and therefore not deductible even though the taxpayer engaged in his trade or business while officially representing the Park Board at the Seattle meeting. Plaintiff's visit to and interest in The North Pole resort in July, 1956, and his visits to and interest in the other places going and coming from Seattle are in the same position. There can be no doubt that plaintiff was better able to discharge his public duty by reason of the visits he made on his personal side trips and that all citizens of Kansas City benefited by that interest but considerations not dissimilar to those mentioned in regard to the South American trip are applicable to plaintiff's side trips as a member of the Park Board. Plaintiff picked the places he wanted to go. He was neither directed, required nor directly authorized by the Park Board to make visits other than attendance at the Seattle meeting. Plaintiff, and not the Park Board, controlled the selection of the places visited and the time of his visits. Such facts are consistent with a personal vacation. (Cf. dissenting opinion in Patterson, supra.)

We would have a different case if those facts were not present. But that is true of most cases. While the public is the beneficiary of plaintiff's interest in the facilities of other cities, the Congress has not seen fit to allow deductions for what in essence was a busman's holiday. We are controlled by the law as enacted by the Congress.

The charitable deduction theory is not tenable in regard to the side trips plaintiff made going to and from the Seattle meeting because, under the facts, the purpose of those trips clearly included a personal vacation element.

Plaintiff's claim in regard to both the South American trip and to the unreimbursed Park Department expenses must therefore be denied.

IT IS SO ORDERED.