HARRIS W. SEED AND NANCY C. SEED, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

GRANT C. EHRLICH AND GRETCHEN W. EHRLICH, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 1845–69, 2300–69. Filed November 18, 1971.

*William K. Rogers*, for the petitioners.
*Robert H. Feldman*, for the respondent.

The Commissioner determined deficiencies in petitioners' income tax as follows:

| Petitioner | Year | Deficiency |
|---|---|---|
| Harris W. and Nancy C. Seed | 1966 | $2, 120. 00 |
| Grant C. and Gretchen W. Ehrlich | 1966 | 1, 318. 98 |

The sole question presented is whether amounts paid by petitioners in connection with a golf tour of Europe sponsored by the People-to-People Sports Committee are deductible as charitable contributions under section 170, I.R.C. 1954.

### FINDINGS OF FACT

The parties have filed a stipulation of facts which, together with accompanying exhibits, is incorporated herein by this reference.

Harris W. and Nancy C. Seed, petitioners in docket No. 1845–69, are husband and wife. They filed a joint Federal income tax return for the calendar year 1966 with the district director of internal revenue, Los Angeles, Calif., and resided in Santa Barbara, Calif., at the time their petition herein was filed. Grant C. and Gretchen W. Ehrlich, petitioners in docket No. 2300–69, are husband and wife. They filed a joint Federal income tax return for the calendar year 1966 also with the district director of internal revenue, Los Angeles, Calif., and resided in Montecito, Calif., at the time their petition herein was filed.

Petitioner Harris W. Seed at all relevant times has been an attorney at law, admitted to practice before the Supreme Court of the State of California and the Tax Court of the United States. Petitioner Grant C. Ehrlich at all relevant times has been treasurer and a director of General Research Corp., a businessman, management consultant, and entrepreneur.

In 1966, all the petitioners were members of private golf clubs in Santa Barbara, Calif. They all enjoyed playing golf, and, except for Mrs. Seed, all were experienced golfers who played once or twice a week. Mrs. Seed was a beginning golfer in 1966 but has since played often. The Seeds and the Ehrlichs were friends. Mr. Seed also acted as general counsel for General Research Corp. of which Mr. Ehrlich was an executive.

Sometime around August, 1966, the Ehrlichs were approached by Robert Vaillancourt (Vaillancourt), the west coast chairman of the

People-to-People Golf Committee, as possible participants in a forth-coming golf trip to Europe to be sponsored by the People-to-People Sports Committee, Inc. (Sports Committee). The Seeds were selected to participate in the same golf trip by Vaillancourt after they were initially recommended by the Ehrlichs to fill a late developing vacancy. The People-to-People Golf Committee, with which Vaillancourt was associated, was part of the People-to-People Sports Committee, which, in turn, was a branch of the general People-to-People Program.

The People-to-People Program was organized around 1957, at the suggestion of President Eisenhower, to supplement the efforts of the Government in broadening understanding and friendship with people of other nations. It functioned through committees, like the Sports Committee, led by prominent American citizens. These committees were private organizations which functioned on their own initiative and responsibility to make the objectives and principles of the United States better understood throughout the world. The Sports Committee was a nongovernmental, nonprofit membership corporation, which attempted to achieve these objectives through sports exchanges between the United States and foreign countries. Such exchanges involved presentation of athletic demonstrations and competitions as well as the training and teaching of athletes and coaches. The Sports Committee also provided gifts of sports equipment to needy, developing nations throughout the world. Based on a description of these activities presented to the Internal Revenue Service, the Sports Committee received an unpublished determination letter dated December 15, 1964, stating that it was an exempt organization under section 501(c)(3) of the Code and that contributions to it were deductible under section 170 of the Code. In some years prior to 1965 the exempt status of the Sports Committee was obtained through an annual certification by the U.S. Information Agency, pursuant to Rev. Rul. 57–38.

In addition to the various athletic activities which it financed out of its own funds, the Sports Committee sponsored certain foreign trips, involving either golf or tennis, in which the participants themselves bore the costs of the trips. The particular type of trip in which petitioners were selected to participate sought to bring people of similar social, economic, and professional positions together through a mutual interest in golf. A schedule of amateur golf competitions was arranged between the participants in the golf tour, who comprised the so-called People-to-People Golf Team (golf team), and several European teams comprised of golfers from the areas and courses to be visited. In some instances, trips of this nature were initiated by re-

quests from U.S. embassies abroad and other Government officials. The tour itineraries were planned by the local chairmen of the various committees, which coordinated the activities of the Sports Committee in respect of specific sports, often after the Sports Committee had suggested the countries to be visited. The Sports Committee was advised of all the details relating to the tours, and, in turn, informed the U.S. Department of State about the projected tours. Though the Sports Committee has not received financial support from the U.S. Government, the State Department has lent some assistance in facilitating the visits of the participants on these tours in the countries visited. Also, the U.S. Information Agency has cooperated with the Sports Committee in respect of these tours.

One of the attractions of such a tour to the participants was the opportunity, otherwise normally unavailable to them, to meet foreigners of similar or perhaps of even higher social position than their own. Thus, in connection with the trip hereinafter described, petitioners on one occasion were guests on the estate of a well-known member of Britain's titled nobility. To date the Sports Committee has sponsored about 10 to 15 golf trips and about 10 tennis trips of the nature of the tour here in question. It was the view of the Sports Committee that the primary beneficiaries of these sports tours were the participants themselves, the foreigners whom they met, and the respective governments.

In connection with the golf trip to Europe in 1966 both the Seeds and Ehrlichs were made associate members of the People-to-People Sports Committee after some initial screening by Vaillancourt and his selection committee. The selection process was based on an evaluation of the candidates' character, social position and, to a certain extent, golfing ability. Other than technical competency golfing proficiency was not a decisive criterion. The Sports Committee stressed the importance of a tour member's ability to be a good representative of the United States consistent with the aims of the People-to-People Program and, on occasion, rejected persons who had traveled on previously sponsored trips because they did not meet this requirement. The Sports Committee did not encourage, or, in fact, accept volunteers for such trips, and, in this instance, the selection of the participants was left to Vaillancourt. In some cases persons who were already associate members recommended possible participants to Vaillancourt.

Among the various materials made available to petitioners prior to their making any payments in connection with the golf tour was a brochure or pamphlet beginning on a letterhead of the Sports Committee entitled "Cost," and a separate sheet on a like letterhead entitled "Payment For The People-To-People Golf Trip to Europe."

These documents recited that the "Estimated cost of this trip" for golfers was $1,890 per person plus $110 per person for cocktail parties, or an aggregate of $4,000 per couple. It was further stated that in the event of "deviations from the standard itinerary, we will credit or charge you accordingly." The foregoing cost was stated to include air transportation, hotel accommodations, meals at specified places, gratuities (hotel service charges and taxes), transfers between airports and hotels (including tips and assistance with luggage), greens fees for scheduled rounds of golf, transportation to and from golf courses, "Donation" of $75 to the "People-to-People Program" to cover overhead and operational expenses, trophies and mementos for presentation to foreign teams, airport taxes, and travel escort. In respect of payment, the brochure (dated June 15, 1966) stated:

Deposits and Final Payment: This trip is limited to 16 male members and their wives. A deposit of $250.00 per person is required for reservation. Please make check payable to the PEOPLE-TO-PEOPLE SPORTS COMMITTEE and mail in the enclosed envelope. Balance of payment will be due on August 1, 1966. The deposit—less $25.00 for handling charges—will be refunded if cancellation is made before date of final payment, August 1. Cancellations received after date of final payment will be charged 5% of the trip cost, plus actual out-of-pocket expenses. Schedules, fares, and rates are subject to change without notice, and all prices are based on the present value of the dollar.

The Ehrlichs in fact made a deposit of $500 in accord with the foregoing paragraph, and paid the remaining $3,500 thereafter in several installments at times not disclosed by the record. The Seeds, who became participants at a late date, paid the entire $4,000 on August 30, 1966. Each couple was required to make such payments in order to take the golf trip. The $4,000 was refundable if the tour were canceled. The Seeds and Ehrlichs made their payments in the expectation of taking the golf tour, and would not have otherwise given the Sports Committee similar amounts. Unlike trips of this type where the participants bear the cost, the other activities sponsored by the Sports Committee were financed in principal part by funds raised by the committee itself. The Sports Committee received substantial contributions from persons other than participants in its programs.

After becoming associate members and either paying the entire $4,000 or part thereof, the Seeds and Ehrlichs were formally invited on August 31, 1966, to join the golf tour to Europe planned by the Sports Committee for late September or early October 1966.

Petitioners also received various other written communications before the golf trip from officials of the Sports Committee and from the travel agency, Haltun Sports Associates, which handled the bookings for the Sports Committee after the itinerary had been set. Such communications described the schedule of events and other details of the

270

trip and indicated throughout that the trip would be enjoyable. One of these communications stated that the golf matches and cocktail parties planned provided a "wonderful opportunity to meet attractive Europeans, with the starting point a mutual interest in golf." The travel literature also advised that a side trip to Tangiers, Morocco, was offered for those who so desired. Petitioners did not elect to go on this side trip.

In addition to the travel literature, petitioners were given a small booklet concerning how U.S. citizens should conduct themselves while visiting foreign countries. The booklet was brief, and was not designed specifically for the type of trip involved. Aside from this booklet and some "oral indoctrination" there were no substantial, formal briefings as to how the members of the golf tour should conduct themselves in relation to the purposes of the People-to-People Program. In order to avoid the appearance that the tour was sponsored by the U.S. Government, the participants were requested not to mention anything to the Europeans about a possible tax deduction in connection with the expenses of the trip.

Many of the participants on the tour had traveled to Europe for pleasure on prior occasions, and some had been there more than once. The Ehrlichs had previously traveled extensively both in the United States and abroad. They had taken five, principally pleasure trips to Europe prior to the 1966 golf tour. These trips were not taken as part of a tour and each lasted 4 to 6 weeks and cost $6,000 to $7,000. Mr. Ehrlich also traveled to South America in the fall of 1961. This trip was made in connection with the U.S. Department of State and the Young Presidents Club of which Mr. Ehrlich was a member. The State Department was investigating the effectiveness of U.S. aid programs in South America, and selected a group of five businessmen to travel to six South American countries and interview young businessmen about their views of the aid programs. The U.S. Government did not pay for Mr. Ehrlich's trip to South America. At the trial herein, Mr. Ehrlich could not remember whether he or his company paid for the trip to South America, or, if he paid for it whether he deducted the expenses related thereto.

Mrs. Seed had not been to Europe before, and her husband had traveled only to London. In preparation for their trip, the Seeds read about the countries they were to visit as part of the golf tour.

Because of the general sophistication of the participants in the tour, it was planned that the participants in the tour be given more independence than members of a regular tour. Moreover, the Sports Committee attempted to make its tours as enjoyable as possible for the participants by arranging good accommodations, meals, transportation, and interesting parties.

The Ehrlichs and the Seeds traveled together in Europe from September 20 to October 19, 1966, as part of the aforementioned Sports Committee golf tour. The tour consisted of approximately 32 members, many or most of them from Southern California. Some of the other participants besides the Seeds were acquaintances of the Ehrlichs. In general, petitioners found the other members of the tour to be congenial companions. All of the men on the trip were golfers. Two of the wives did not play golf and were thus not made associate members of the Sports Committee. The Sports Committee, however, preferred that the golfers be accompanied by their wives in order to meet the Europeans on a family basis, and the nongolfing wives were invited to the social functions which were a part of the tour. In the case of a golfer who was accompanied by his nongolfing wife, the husband paid an amount to the committee in the manner of the petitioners' payments as well as an additional amount directly to the travel agency for his wife. All the participants on the tour including the Ehrlichs and Seeds flew to Europe on a commercial flight. The hotels at which the members of the tour stayed in the European cities visited were among the best hotels in those cities and were rated "deluxe." In some instances, however, petitioners did not have the best rooms in these hotels. The tour members were given the opportunity to obtain suites in the hotels and to rent automobiles at an extra charge, and the Ehrlichs did rent a suite at the Savoy Hotel while the tour was in London. A travel escort accompanied the tour and handled all the travel arrangements for the convenience of the participants.

During the 30-day tour the men on the golf team played 14 or 15 rounds of golf, including practice rounds, while the women golfers played about 12 or 13 rounds, including practice rounds. The golf courses played during the tour were among the finest in Europe and included the Portmarnock Golf Club in Dublin, Ireland, the King's Course at Gleneagles and the Pitlochry Golf Club, both in Perthshire, Scotland, the Sunningdale Golf Club in Berkshire, England, the Golf-Club Wien in Vienna, Austria, the Lausanne Golf Club, Lausanne, Switzerland, and Sotogrande on the Costa del Sol in Spain. Mr. Seed and Mr. Ehrlich played all of the scheduled matches except one with the Dunwhinny Golf Club at Gleneagles, which was an invitation match. Both Mrs. Seed and Mrs. Ehrlich missed one of their scheduled matches because of illness.

During the period when the tour was en route from Switzerland to Spain, petitioner Grant C. Ehrlich made a short side trip to Lyon, France, for a business meeting on behalf of a corporation in which he was a stockholder and an unpaid officer.[1] He then rejoined the tour

---

[1] In their amended petition, the Ehrlichs claimed that expenses incurred in connection with this side trip were deductible under sec. 162, I.R.C. 1954. However, they have abandoned that issue on brief.

at Sotogrande on the Costa del Sol in Spain, and did not miss any of the scheduled matches as a consequence.

The golf matches afforded petitioners the opportunity to meet many Europeans on a person-to-person basis and to become friendly with many of them. Petitioners also gave their golf opponents small personal gifts which they brought from the United States as a gesture of good will.

In addition to the golf matches, petitioners attended numerous receptions and cocktail parties which were also part of the planned activities of the tour. These receptions were attended by the American and European golfers and frequently by dignitaries and other local residents. At each of the cities visited the American golf team "hosted" a reception for the European golfers. These receptions were paid for out of the payments made to the Sports Committee by the petitioners and the other members of the tour. At these receptions a member of the People-to-People Golf Team would give a short speech in the local language, if possible, and present mementos or trophies to the captain of the European team. Usually, the European team reciprocated by "hosting" a similar event for the Americans. There were also many other social meetings between the members of the golf tour and the Europeans in addition to these receptions. The American golfers were often invited to play unscheduled rematches at the European golf clubs as a result of these social activities.

The involvement of the Sports Committee in these events was made apparent by blazers with "People-to-People Golf Team" crests on the breast pockets worn by members of the tour. The golf tour also received newspaper coverage in at least one of the European cities visited, and in a Santa Barbara newspaper which mentioned that the Seeds and Ehrlichs had been on the tour. Moreover, through such activities the petitioners promoted the purposes of the Sports Committee by meeting with the Europeans on a person-to-person basis in an atmosphere of mutual understanding and friendship.

As a result of the tour the Seeds formed a lasting friendship with a Scottish solicitor and his wife, who visited the Seeds at their home in Santa Barbara in 1968. Also, in 1970 a similar team from Great Britain toured the United States, and a member of the British team and his wife stayed with the Ehrlichs when the team visited Santa Barbara.

In general the petitioners enjoyed the trip and enjoyed meeting the Europeans; and they have since recommended the People-to-People Golf Tour to friends. The planned activities of the tour and meeting with the Europeans socially, however, were time-consuming and exhausting. Indeed, all of the petitioners found the tour to be more rigorous, in terms of the number of events, and more tiring than they

had expected, and because of these experiences the activities on subsequent tours have been decreased. Despite the pace of the tour, the petitioners did manage to do a limited amount of sightseeing on their own. Mrs. Seed, who had not traveled to Europe before, and Mr. Seed, who had visited only London previously, went sightseeing in each country they visited. The Ehrlichs, who had traveled extensively through Europe, generally went to the theater or opera on their free evenings.

Aside from the $4,000 payment which both the Ehrlichs and Seeds made to the Sports Committee in connection with the trip, each couple incurred out-of-pocket expenses for meals, tips, caddy fees, and similar items in the stipulated amount of $450. Other than the $4,000 payment and the payments aggregating $450, petitioners did not become involved in the paying of bills or the allocation of costs.

In 1969, the Seeds took a second People-to-People Sports Committee sponsored golf tour to the Orient. They paid $4,730 to the Sports Committee in connection with this trip.

The Seeds and the Ehrlichs treated the amounts paid to the Sports Committee in connection with the 1966 golf tour as deductible charitable contributions on their respective tax returns for 1966. The parties have stipulated that petitioners Seed and Ehrlich reported adjusted gross income, total contributions, and contributions to the Sports Committee on their respective tax returns in the years and amounts as follows:

| Year | Adjusted gross income | Total contributions claimed (including amounts paid to Sports Committee) | Amounts paid to Sports Committee |
|------|------|------|------|
| *Petitioners Seed* | | | |
| 1964 | $68,082.84 | $621 | 0 |
| 1966 | 71,891.00 | 5,229 | $4,000 |
| 1967 | 57,250.00 | 1,127 | 0 |
| 1968 | 75,817.00 | 2,278 | 10 |
| 1969 | 58,413.00 | 5,878 | 4,740 |
| *Petitioners Ehrlich* | | | |
| 1966 | 80,180.00 | 4,615 | 4,000 |
| 1967 | 50,217.53 | 799 | 0 |
| 1968 | 41,088.00 | 747 | 0 |

In his deficiency notices to the Seeds and Ehrlichs, the Commissioner disallowed charitable deductions relating to the $4,000 payments to the People-to-People Sports Committee in connection with the 1966 golf tour. In their amended petitions the petitioners alleged that, in addition to these $4,000 payments, each couple incurred certain unreimbursed expenses as an incident to rendering gratuitous services to the Sports Committee and claimed a refund in respect of these additional expenses.

OPINION

RAUM, *Judge:* The tax-exempt status of the People-to-People Sports Committee was determined by the Commissioner in a private letter (dated December 15, 1964), and the Commissioner does not dispute that "charitable contribution[s]" to the Sports Committee would be deductible under section 170, I.R.C. 1954, pursuant to that letter. After certain concessions, the sole question to be decided is whether the $4,000 payments which both the Seeds and Ehrlichs made in connection with the Sports Committee sponsored golf tour and certain additional out-of-pocket expenses incurred by each couple in the stipulated amount of $450 constitute "charitable contribution[s]" within the meaning of section 170(c)(2), I.R.C. 1954. In respect of the $4,000 payments the petitioners have presented alternative arguments. They contend that the amounts are deductible either as direct contributions to the Sports Committee, or alternatively as "unreimbursed expenditures made incident to the rendition of services" to a qualified organization pursuant to section 1.170–2(a)(2), Income Tax Regs. Petitioners' argument in respect of the $450 in out-of-pocket expenses, incurred by each couple in connection with the golf tour, is based solely on section 1.170–2(a)(2).

Section 170(c)(2), I.R.C. 1954, generally defines "charitable contribution" as a "contribution or gift" to those private organizations which meet the requirements set forth in that section.[2] And section 1.170–2(a)(2) provides that "unreimbursed expenditures made incident to the rendition of services" to a qualified organization may constitute such a deductible contribution.[3] The burden of proving that

---

[2] SEC. 170. CHARITABLE, ETC., CONTRIBUTIONS AND GIFTS.

(c) CHARITABLE CONTRIBUTION DEFINED.—For purposes of this section, the term "charitable contribution" means a contribution or gift to or for the use of—

\* \* \* \* \* \* \*

(2) A corporation, trust, or community chest, fund, or foundation—

(A) created or organized in the United States or in any possession thereof, or under the law of the United States, any State or Territory, the District of Columbia, or any possession of the United States ;

(B) organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes or for the prevention of cruelty to children or animals ;

(C) no part of the net earnings of which inures to the benefit of any private shareholder or individual ; and

(D) no substantial part of the activities of which is carrying on propaganda, or otherwise attempting. to influence legislation.

A contribution or gift by a corporation to a trust, chest, fund, or foundation shall be deductible by reason of this paragraph only if it is to be used within the United States or any of its possessions exclusively for purposes specified in subparagraph (B).

[3] Sec. 1.170–2 Charitable deductions by individuals ; limitations.

(a) *In general.* \* \* \*

(2) No deduction is allowable for contribution of services. However, unreimbursed expenditures made incident to the rendition of services to an organization contributions to which are deductible may constitute a deductible contribution. For example, the cost of a uniform without general utility which is required to be worn in performing donated services is deductible. Similarly, out-of-pocket transportation expenses necessarily incurred in rendering donated services are deductible. Reasonable expenditures for meals and lodging necessarily incurred while away from home in the course of rendering donated services also are deductible. \* \* \*

such payments or expenditures qualify as charitable contributions rests with the petitioners. *Arthur I. Saltzman*, 54 T.C. 722, 724. We think that the payments in question do not constitute "charitable contribution[s]" within the meaning of section 170 and the regulations thereunder.

It is well settled that the term "charitable contribution" as it is used generally in section 170 and the regulations is synonymous with the word "gift." *Harold DeJong*, 36 T.C. 896, 899, affirmed 309 F. 2d 373, 376–379 (C.A. 9); *Jordon Perlmutter*, 45 T.C. 311, 316–317; *James A. McLaughlin*, 51 T.C. 233, 234, affirmed per curiam in an unreported opinion (C.A. 1, May 28, 1969, 23 A.F.T.R. 2d 69–1763, 69–2 U.S.T.C. par. 9467); *Edward A. Murphy*, 54 T.C. 249, 252; *Harold E. Wolfe*, 54 T.C. 1707, 1713; *Larry G. Sutton*, 57 T.C. 239, 242; cf. *Sarah Marquis*, 49 T.C. 695, 702. "A gift is generally defined as a voluntary transfer of property by the owner to another without consideration therefor. If a payment proceeds primarily from the incentive of anticipated benefit to the payor beyond the satisfaction which flows from the performance of a generous act, it is not a gift." *Harold DeJong*, 36 T.C. at 899, affirmed 309 F. 2d 373 (C.A. 9). The cases have therefore sought to distinguish between any direct benefit inuring to the transferor of property to a recipient described in section 170(c) and the benefit which inures to the general public from the transfer and indirectly to the transferor. *Jordon Perlmutter*, 45 T.C. 311, 318; *Edward A. Murphy*, 54 T.C. at 252–253; *Citizens & Southern National Bank of South Carolina* v. *United States*, 243 F. Supp. 900 (W.D.S.C.). Thus, not every payment to an organization which qualifies as a charity is a charitable contribution. *Estate of Willis D. Wood*, 39 T.C. 1, 6; *Edward A. Murphy*, 54 T.C. at 252. The same rules also apply in the case of expenses incurred incident to rendering services to a qualified organization. *Arthur I. Saltzman*, 54 T.C. 722, 725. Cf. *Green* v. *Bookwalter*, 207 F. Supp. 866, 880 (W.D. Mo. 1962), affirmed 319 F. 2d 631 (C.A. 8); *Orr* v. *United States*, 343 F. 2d 553, 557 (C.A. 5), affirming 226 F. Supp. 809 (M.D. Ala.).

In return for the amounts they expended in connection with the golf tour—the $4,000 paid to the Sports Committee and the additional $450 in out-of-pocket expenses—petitioners received substantial consideration. They toured Europe for a month with people whom they found to be congenial. They stayed at "deluxe" hotels, albeit not always in the best rooms. They played golf at some of the finest golf courses in Europe. And they met Europeans of a social and economic position similar to their own, to whom otherwise they might not have had access. Surely, there was a substantial element in the payments in issue which was related to benefits flowing to petitioners. Indeed, in the view of the Sports Committee itself, the petitioners were among

the primary beneficiaries of the tour. We, therefore, think that the amounts in question do not constitute charitable contributions whether they are viewed as either direct payments or expenses incurred in the rendition of services to the Sports Committee.

As part of their argument under section 1.170–2(a)(2), the petitioners contend that the expenses in question would not have otherwise been incurred "but for" the fact that petitioners rendered gratuitous services to the Sports Committee. Cf. *Orr* v. *United States*, 343 F. 2d at 557 (C.A. 5), affirming 226 F. Supp. 809 (M.D. Ala.). Moreover, they argue that "What was received by Petitioners was no more than part (not even all) of what was necessary to put Petitioners in the position and context to perform their gratuitous services as desired by the [Sports] Committee." It is petitioners' position that "even if the trip in question was a 'benefit' to Petitioners, it was part of the fundamental method by which the [Sports] Committee carries out its work." We think this argument does not aid petitioners' case. Expenses incurred in the rendition of services to a qualified charitable organization may, and often do, have a dual character. They may benefit both the charity and the taxpayer. See *Green* v. *Bookwalter*, 207 F. Supp. at 880 (W.D. Mo.), affirmed 319 F.2d 63 (C.A. 8); *Orr* v. *United States*, 343 F. 2d at 557 (C.A. 5), affirming 226 F. Supp. 809 (M.D. Ala.). Cf. *Edward A. Murphy*, 54 T.C. at 254. As we have already noted, in such a situation it is important to distinguish between the direct benefits which flow to the taxpayer as a consequence of payments to, or expenses incurred for the use of, a qualified organization, and the benefits accruing to the charity itself and only indirectly to the taxpayer as a member of the general public. Although the charity may also benefit from such payments, the presence of substantial direct personal benefit inuring to and anticipated by the taxpayer is fatal to any characterization of the payments or expenses as "charitable contributions." See *Arthur I. Saltzman*, 54 T.C. at 725. We think such is similarly the case where by the very nature of the exempt activity the taxpayer is among the primary beneficiaries of the payments made or expenses incurred by him in support of that activity. Cf. *Estate of O. J. Wardwell*, 35 T.C. 443 (room endowment to old-age home); *Harold DeJong*, 36 T.C. at 899–900, and *James A. McLaughlin*, 51 T.C. at 234 (tuition payment to tax-exempt institution which operated schools); *Edward A. Murphy*, 54 T.C. at 252–253 (adoption fee payment to adoption agency).

The question in each instance is whether the payment was in fact made in order to obtain the benefits flowing to the "contributor"—i.e., whether the "gift" was made "in expectation of the receipt of certain specific direct economic [or other] benefits within the power of the

recipient to bestow directly or indirectly, which otherwise might not be forthcoming." *Stubbs* v. *United States*, 428 F. 2d 885, 887 (C.A. 9). And on the record before us we have no doubt that the payments and expenditures in issue were made by petitioners in exchange for the consideration received. Cf. *United States* v. *Transamerica Corporation*, 392 F. 2d 522, 524 (C.A. 9). Indeed, the "contributions" were refundable in the event that the tour were canceled, and even individual cancellations received after date of final payment (August 1, 1966) were to result in charges of only 5 percent of the trip cost plus actual out-of-pocket expenses. This is hardly compatible with bona fide charitable contributions, and strongly supports the conclusion that petitioners were paying for a golfing tour to Europe rather than making charitable contributions.[4]

Both the petitioners and the Commissioner have referred us to *Sheffels* v. *United States*, 264 F. Supp. 85 (E.D. Wash.), affirmed per curiam 405 F. 2d 924 (C.A. 9). In *Sheffels* the taxpayers claimed charitable deductions for certain travel expenses incurred in connection with a tour which was also planned by a local chapter of the People-to-People Program. Though the local chapter in *Sheffels* was never certified by the U.S. Information Agency pursuant to Rev. Rul. 57–38, 1957–1 C.B. 96, or otherwise determined to be an exempt organization by a private ruling, as was the Sports Committee in the case before us, the District Court did not view the absence of such certification in itself fatal to the deductions claimed. Rather, the court decided that the payments were not used "for exclusively public purposes" within the meaning of section 170(c)(1), I.R.C. 1954, and on this basis denied the deductions claimed. The court stated (264 F. Supp. at 89):

> Here the payments claimed were for the use of the individual taxpayers as well as for the United States. Under the facts in this case as they have been developed, the taxpayer is the primary beneficiary and the purposes of the government are served only incidentally. I can see very little difference between the private trips made by the ordinary tourist and those made by the taxpayers here. * * *

The petitioners point out that *Sheffels* was decided under section 170(c)(1) which requires that a contribution or gift be "made for exclusively public purposes." They argue that the language under section 170(c)(2), upon which they base their case, requires only that the recipient be "*organized and operated exclusively* for religious, char-

---

[4] Moreover, it is interesting to note that, apart from the amounts here in controversy, petitioners' *total* charitable contributions were of a substantially lower order of magnitude than the golf tour payments involved herein (see p. 273 *supra*)—a circumstance strongly suggestive of the absence of any charitable donative purpose in the context of this case.

**278**

itable, scientific, literary, or educational purposes" (emphasis supplied). Seizing upon the difference in language, petitioners argue that the benefit accruing to them is without consequence to the deductibility of the payments in question as long as the charitable organization is organized and operated exclusively for the enumerated purposes. Such is not the law. It is well settled that consideration of the benefits received by a taxpayer in return for a payment to an organization described in section 170(c)(2) is necessary to a determination of whether the payment constitutes a "contribution or gift." See *Estate of O. J. Wardwell*, 35 T.C. at 450; *Harold DeJong*, 36 T.C. at 899–900; *James A. McLaughlin*, 51 T.C. at 234; *Edward A. Murphy*, 54 T.C. at 252–253; and *Donald W. Fausner*, 55 T.C. 620, 624.

Of course, it may be possible to combine a gift to charity with a payment in exchange for consideration flowing to the contributor, and in such situation a deduction may be allowable to the extent that the payment exceeds the consideration. *Harold DeJong*, 36 T.C. at 899, 900. See also *Edward A. Murphy*, 54 T.C. at 254. However, petitioners have not raised this issue, and indeed have conceded in their reply brief that "the fair market value of the goods and services received by * * * [them] does approximate the amount of money they spent." Accordingly, we approve the Commissioner's determination.

*Decisions will be entered for the respondent.*