JOHN C. DOCKERY AND EMILY C. DOCKERY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent NICHOLAS W. DOCKERY AND MARY E. DOCKERY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Dockery v. Commissioner
Docket Nos. 2082-74, 2083-74.
United States Tax Court
T.C. Memo 1978-63; 1978 Tax Ct. Memo LEXIS 454; 37 T.C.M. (CCH) 317; T.C.M. (RIA) 780063; February 21, 1978, Filed *454 Held, the transfer by petitioners of a waterline they constructed which connected to the city of Rockingham's water system as required by a city ordinance did not qualify as a charitable deduction. Rather, such costs are to be capitalized under sec. 263. Held,further, respondent's disallowance of away-from-home expenditures upheld as petitioners did not meet sec. 274(d) substantiation requirements.Held,further,Cohan rule applied to ascertain the basis of assets sold but inapplicable to value basis of additional assets allegedly abandoned where there was no proof of what items were abandoned. John C. Dockery, pro se. Wright Tisdale, Jr., for the respondent. IRWIN
MEMORANDUM FINDINGS OF FACT AND OPINION IRWIN, Judge: Respondent determined deficiencies in income tax as follows: [1] Docket No.
Petitioners
Year
Amount
2082-74
John C. Dockery and
1967
$3,384.02
Emily C. Dockery
1968
1,360.44
2083-74
Nicholas W. Dockery
1966
511.77
and Mary E. Dockery
1967
3,298.51
1968
1,867.12 Concessions having been made, the following issues remain for our consideration: (1) Whether petitioners John C. and Emily C. Dockery *455 incurred away-from-home expenses in excess of $2,000 in each of the years 1967 and 1968; (2) Whether petitioners John C. and Emily C. Dockery and Nicholas W. and Mary E. Dockery are entitled to a charitable contribution deduction for the taxable year 1967 on a waterline which was constructed and deeded to the city of Rockingham in that year by the Dockery Stainless Steel Co., a partnership owned equally by John C. and Nicholas W. Dockery; (3) The amount of ordinary income and capital gain realized in 1966 from the sale of certain assets of Dockery Stainless Steel Co. by petitioners John C. and Emily C. Dockery and Nicholas W. and Mary E. Dockery; and (4) The amount of abandonment loss in 1966 incurred by petitioners Nicholas W. and Mary E. Dockery as a result of the abandonment of certain items by Dockery Stainless Steel Co. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts together with the exhibits attached thereto are incorporated herein by this reference. Petitioners John C. and Emily C. Dockery (hereafter John and Emily), husband and wife, resided in Rockingham, N.C., at the time of filing their petition herein. Petitioners John and Emily, using *456 the cash basis method of accounting, filed a joint income tax return for calendar year 1967 with the District Director of Internal Revenue, Greensboro, N.C., and their joint income tax return for 1968 with the Internal Revenue Service Center, Chamblee, Ga. Petitioners Nicholas W. and Mary E. Dockery (hereafter Nicholas and Mary) husband and wife, resided in Rockingham, N.C., at the time of filing their petition herein. Petitioners Nicholas and Mary, using the cash basis method of accounting, filed joint income tax returns for calendar years 1966 and 1967 with the District Director of Internal Revenue, Greensboro, N.C., and they filed a joint income tax return for the calendar year 1968 with the Internal Revenue Service Center, Chamblee, Ga.
For a number of years and in 1966, 1967 and 1968, John and Emily owned a farm near Rockingham, N.C., and a home constructed by John in Myrtle Beach, S.C., for the family's use while operating the business there. During this period, Emily operated a towel shop business in Rockingham and also operated three towel shops at Myrtle Beach which were generally kept open from March until October. [2] One store sometimes remained open all year round if *457 the temperature was not too cold. The two teenage daughters of John and Emily worked in the towel shops at Myrtle Beach and roomed in the family residence there during the summers between school terms in 1966, 1967 and 1968. The daughters were paid the same salary as were the regular clerks. John assisted in running the stores in various ways but never received any salary for his work. Emily computed her family's away-from-home living expenses to be $5,966 in 1967 and $7,048 in 1968. [3] *458 No expenses were claimed by Emily or John on their returns, but in the statutory notice of deficiency, respondent allowed them a deduction of $2,000 in each of the years for away-from-home expenses. Between the years 1961-1966, the Dockery Stainless Steel Co. (hereafter sometimes Dockery), a partnership owned equally by John and Nicholas, purchased an unknown amount of machinery, most of which was bought at auction sales or was Government surplus, for use in its stainless steel valve manufacturing business. In 1966, John and Nicholas decided to get out of the business, and on August 1, 1966, leased the building which they used for the business to Rockingham Steel Co. At the same time, they sold 102 pieces of machinery and equipment used in their business to Rockingham Steel Co. for $261,000. The lease required Dockery to remove from the premises machinery Rockingham Steel Co. did not want. Dockery removed all the unwanted machinery and apparently abandoned it except for two pieces of equipment sold to other companies for $3,000. The lease also required the Dockerys to *459 provide a washroom and, upon written demand of Rockingham Steel Co., an automatic sprinkler system and water mains. It is impossible to tell from petitioners' tax returns, or from anything else in the record, exactly what basis Dockery used in order to compute its gain on the sale to Rockingham Steel Co. Although we expressly do not find such an amount, it appears that the basis used by Dockery on its return, including the inventory items, was approximately $93,000. Both respondent and petitioners were forced to reconstruct Dockery's basis in the assets because of a fire in mid-1964 that destroyed the bulk of Dockery's business records. However, there is no dispute over the basis of the five pieces of equipment purchased by Dockery in 1965 or 1966 (a total basis in the amount of $3,290). The adjusted bases of 26 other items purchased before 1965 are also not in dispute. That figure has been established to be $26,045.28 from the depreciation schedule attached to the Dockery partnership return for 1965. Respondent allowed an additional $9,525.13 basis for the noninventory items sold that were purchased before 1965 and not on the depreciation schedule [4] for a total adjusted basis *460 in all noninventory goods of $38,860.41. Of the 102 items Dockery sold to Rockingham Steel Co., respondent determined that five items consisted of inventory and had a total fair market value of $17,000 and zero cost basis. [5] In addition to the sale of machinery to Rockingham Steel Co., Dockery abandoned an indeterminate amount of machinery in 1966, estimated by petitioners to be between 40 and 60 items. As noted earlier *461 in computing the gain on the sale, respondent permitted the petitioners to deduct $9,525.13 for items abandoned by Dockery, the adjusted basis of 15 items which were abandoned as determined from the depreciation schedule. Petitioners also abandoned nine other items listed on the schedule which respondent did not allow. However, these additional items were fully depreciated by Dockery at the time of their abandonment. On January 3, 1967, Dockery entered into a contract with the city of Rockingham whereby Dockery agreed to install a six-inch water pipeline, running from petitioners' business approximately 1,000 feet outside Rockingham's city limits, and connecting to the city pipeline, approximately 300 feet within the city limits. The city agreed to pay one-half the cost of digging and laying the pipeline plus one-half the cost of the pipe, connections, and valves for that part lying within the city limits. The line was laid in compliance with plans and specifications submitted to the city and filed with the North Carolina Highway Department. These plans and specifications complied with all the provisions of the Rockingham City Code. After having constructed the waterline (at *462 a cost of between three and four times its expected cost of $1,300), Dockery conveyed the line to the city as required by Rockingham's city ordinances, section 25-39, which mandated that any water facility connected to the city's water system be deeded to the city. The fair market value at the time of conveyance in 1967 was $6,650. Dockery, in the conveyance, further reserved the right to demand water services under such charges and regulations as provided by the city for other outside city water connections and services. Petitioners then connected a one-inch line from their building to the six-inch main line. Petitioners built the larger six-inch line mainly to accommodate the needs of a real estate development which lay beyond their property and further outside the city limits of Rockingham and from which the developer laid a waterline to their property. OPINION 1. Away-from-home Expenses
Petitioners John and Emily contend they are entitled to claim more than the amount of $2,000 allowed by respondent as away-from-home expenses for each of the taxable years 1967 and 1968. It is not clear, however, whether they seek to deduct expenses attributable to their children. Respondent *463 argues that section 274[6] mandates disallowance of the additional expenses as they are unsubstantiated. Respondent also contends that Myrtle Beach is the tax home of petitioners, and such expenses must be disallowed as they do not meet the requirement of section 162, but rather are in the nature of personal expenses, nondeductible under section 262. Respondent further contends that no expenses attributable to John are deductible because they are not trade or business expenses. Finally, respondent states that even if petitioners' expenses are otherwise allowable, no deduction is permitted petitioners for any expenses incurred by them to support their children while the children lived and worked at Myrtle Beach because section 73, which treats the income as the gross income of the children, also treats such deductions as expenses of the children, deductible by the children but not by their parents. Section 162(a) provides, in pertinent part, that a deduction shall be allowed for all the ordinary and necessary expenses paid or incurred during the taxable year in carrying *464 on any trade or business, including traveling expenses (embracing amounts expended for meals and lodging other than amounts which are lavish or extravagant under the circumstances) while away from home in the pursuit of a trade or business. The statute permits a taxpayer to deduct the entire amount expended for his meals and lodging while in a travel status subject to the provisions of section 274(d).
Section 274(d) provides, in part, that no deduction shall be allowed under section 162 for any travel expenses, including meals and lodging while away from home, unless the taxpayer substantiates by adequate records or by sufficient evidence corroborating his own statement (a) the amount of such expense or other items or (b) the time and place of the travel or use of the facility.
Section 1.274-5(c)(2), Income Tax Regs., describes more specifically the substantiation requirements of section 274(d). Under the regulations, upheld in Sanford v. Commissioner,412 F. 2d 201 (2d Cir. 1969), cert. denied 396 U.S. 841 (1969), affg. 50 T.C. 823 (1968), petitioners must in the very least support their claimed deductions by an account book, diary, statement of expense or similar record in which *465 various elements of the expenditures are recorded. Although Emily stated that she had some documentary evidence to support her testimony, no such evidence was introduced into the record. Petitioners produced no records or diaries, contemporaneous or otherwise, or any other evidence of the amount of their living expenses. Although Emily testified to the total number of days she and John were present at Myrtle Beach and the costs of renting a cottage in the summer, she could not remember what dates she, her husband, or her family were there, nor did she break down her estimated daily living expenses into utility bills, food, entertainment, or any other category. This fails to meet the requirements of section 1.274-5(c)(2).
Section 1.274-5(c)(3), Income Tax Regs., permits petitioners, if they fail to meet the adequate records requirement of section 1.274-5(c)(2), to establish such element (an by their own statements, containing specific information in detail as to establish such element, and (b) by other corroborative evidence sufficient to establish such element. Petitioners rely entirely upon Emily's unsupported testimony, however, and no deduction is to be allowed solely on the *466 basis of such unsupported self-serving testimony. Sanford v. Commissioner,supra.Whether or not we consider her estimate excessive, absent the statutory substantiation of her claimed deduction, section 274(d) mandates disallowance. As a result, we do not reach respondent's other contentions on this issue. 2. Charitable Contribution
Petitioners contend that although Dockery received a benefit from construction of the waterline, it was unnecessary for its needs since there was a well at the building which adequately supplied its needs. Petitioners further argue that they decided to build the waterline and give it to the city before they knew they would be required to donate it Rockingham, although they admitted that before any construction had begun they were aware of the requirement. In the alternative, petitioners argue that if the Court should find the donation was not a charitable contribution because it was directly related to their business, they suffered a loss on the "sale" to the city of the waterline, having transferred it for "one dollar and other valuable consideration." Respondent's position is that the purpose of the transfer was to directly benefit Dockery and that *467 under these circumstances the deduction was not for a charitable purpose under section 170, but for the anticipated benefit. Respondent also contends that since the only persons who used the waterline at the time of its installation were Dockery and the developer, but not the general public, that the waterline was not for the exclusive use of the public. Respondent relies on the Supreme Court's decision in Commissioner v. Duberstein,363 U.S. 278 (1960), for the proposition that for a transfer to be a qualified gift under section 170, it must have been made from a detached and disinterested generosity. In DeJong v. Commissioner,36 T.C. 896 (1961), affd. 309 F. 2d 373 (9th Cir. 1962), we held that the term "charitable contribution" as used in section 170 is synonymous with the word "gift." We then enunciated the following test: "if a payment proceeds primarily from the incentive of anticipated benefit to the payor beyond the satisfaction which flows from the performance of a generous act, it is not a gift." On appeal, the Ninth Circuit broadened our holding and held that the principles applied by the Supreme Court in Duberstein with regard to the meaning of the term "gift" as used *468 in section 102(a) were equally applicable with regard to the term "gift" as used in section 170. However, while the Duberstein criteria may still hold validity with respect to charitable contributions made by individuals, e.g. Fausner v. Commissioner,55 T.C. 620 (1971); Wolfe v. Commissioner,54 T.C. 1707 (1970), we believe these criteria are inappropriate to determine if a business entity, such as a corporation or partnership, has made a charitable contribution entitling it to a deduction under section 170. Doubt was first cast on Duberstein in Perlmutter v. Commissioner,45 T.C. 311 (1965), although one year later, this Court did hold that the disinterested generosity test applied to business entities in section 170 cases, Crosby Valve & Gage Co. v. Commissioner,46 T.C. 641 (1966), affd. on other grounds, 380 F. 2d 146 (1st Cir. 1967), cert. denied 389 U.S. 976 (1967), but this test was specifically rejected by the First Circuit on appeal, which, however, did not enunciate a new test. Soon after Crosby, however, we stated in Marquis v. Commissioner,49 T.C. 695, 702 (1968), that "we need not go so far as to suggest that the narrow [Duberstein] test * * * is the determinant *469 of a charitable contribution." [7]
The Ninth Circuit took the lead in abandoning the Duberstein test in cases involving business entities, distinguishing DeJong,supra, and other cases involving individual taxpayers. The court in United States v. Transamerica Corp.,392 F. 2d 522 (9th Cir. 1968), noted that an absolute requirement of detached and disinterested generosity or lack of any business purpose would tend to deny substantially all charitable contributions made by a business. Instead, the court applied a new test permitting a corporation to receive an indirect business benefit incidental to the public use or to public recognition, but if it receives a direct economic benefit, section 170 is not *470 met. This was further refined in Stubbs v. United States,428 F.2d 885 (9th Cir. 1970), wherein the court noted that the expectation of a benefit need not be the sole purpose of a donation in order to deny a charitable deduction; it would suffice if it were the dominant motive. In Allen v. United States,541 F. 2d 786 (9th Cir. 1976), the Ninth Circuit again held that Duberstein was too broad in determining what constitutes a charitable contribution; the proper test being the dominant purpose of the transaction, and that the existence of a quid pro quo could be considered as evidence that the dominant purpose behind the transfer was the expectation of economic benefit. In Singer Co. v. United States,449 F. 2d 413 (Ct. Cl. 1971), the Court of Claims refused to apply Duberstein to section 170 cases involving business entities. Instead the court adopted the quid pro quo test. Specifically, it does not matter whether the benefits received by the donor are direct or indirect; but rather if the benefits received, or expected to be received, are substantial; that is, if the benefits which inure to the transferor are greater than those which inure to the general public, then the transferor *471 has received a quid pro quo sufficient to deny it a deduction under section 170. As can be seen, the cases do not consistently apply the same tests. However, as we noted in Seed v. Commissioner,57 T.C. 265 (1971), the cases have sought to distinguish between any direct benefit inuring to the transferor and the benefit which inures to the general public from the transfer and indirectly to the transferor. In Louisville & Nashville Railroad Co. v. Commissioner,66 T.C. 962 (1976), we noted the Singer test with approval. Although in that case we also relied upon DeJong,supra, we did not apply the rigid Duberstein criteria for which DeJong might also be noted, but rather cited it for the more limited proposition that a gift is a voluntary transfer of property by the owner without receiving consideration therefor from the donee. This is a less restrictive test than Duberstein for clearly there are instances in which a business entity may make a donation with less than a "disinterested generosity" and yet receive little or no benefit therefrom. Under Duberstein, such donations would be denied the benefits of section 170. [8] Similarly, there are instances in which a business may make *472 a donation without receiving consideration from the donee and yet reap a substantial benefit therefrom. Nonetheless, under any of the tests applied by the courts, we do not believe that petitioner would be entitled to a charitable contribution deduction on the facts here. In a factually analogous situation, Wolfe v. Commissioner,54 T.C. 1707 (1970), we held that a charitable contribution deduction was not to be allowed. There, 43 residents of a subdivision, including the taxpayer, contributed money into a fund for the construction of sewer and waterlines in the streets of a village. As a group, they entered into an agreement with a contractor to construct the lines in conformity with an understanding with the village which adopted ordinances providing that upon completion of the construction, the town would accept conveyance of all the lines and do whatever might be necessary to operate the system. The taxpayer there *473 testified that for seven years prior to the construction of the water and sewer system he had used his own water well and septic tank; he, therefore, did not need the use of the water and sewer lines; he participated only to benefit those who did need the facilities; and he did not expect a quid pro quo from the village in consideration for the transfer. This Court held that the taxpayer and other participants transferred their interests in the water and sewer lines to the town in consideration for the undertaking by the town to maintain and operate the system; since this was consideration received for the transfer, it did not qualify as a gift. The facts in this case are almost identical and we find that petitioners received consideration from the city for the transfer of the waterline sufficient to deny them a deduction; petitioners testified they had a water well which supplied their needs; they participated in order to help those who did need the facility )the real estate development); they intended the transfer to be a gift; and the city of Rockingham agreed to maintain and operate the system. Even if we considered the transfer to have been made without consideration from the *474 city of Rockingham, the deduction would have to be disallowed. Applying the Singer rationale, petitioners herein received benefits which were greater than those received by other members of the public, none of whom benefitted in any respect from the line's installation, save those in the real estate development, and thus petitioners received a quid pro quo. Moreover, the evidence suggests that the construction of the waterline bore a direct relationship to petitioners' business and was constructed primarily from the expectation of a direct benefit for their business, sections 1.170-1(c)(1) and 1.170A-1(c)(5), Income Tax Regs, and Allen v. United States,supra;DeJong v. Commissioner,supra. The lease required Dockery to provide a washroom and, upon written request, certain fire protection systems requiring a waterline. Although petitioner testified they did not need the waterline because of a well at the site, they conceded it did benefit the building and hooked a on-inch pipe from their building into the main line. We are convinced, however, that the construction by petitioners using the six-inch line conferred no additional benefit beyond the benefits received by construction of *475 the one-inch line, and was used only to accommodate the needs of the real estate developer. Although a deduction under section 170 is allowed for the excess of the amount transferred over the amount of financial or economic benefit received on the transfer, Oppewal v. Commissioner,468 F. 2d 1000 (1st Cir. 1972), affg. on other grounds T.C. Memo. 1971-273; DeJong v. Commissioner,supra, we do not believe that petitioners are entitled to deduct the incremental cost borne in constructing the larger line. Here the benefit was not received by the general public even though the contribution was to Rockingham, but rather was for the exclusive benefit of the real estate developer. Moreover, there is nothing in the record from which we may make a determination of the incremental cost. Petitioners contended at trial that if no charitable deduction is allowed, they should be entitled to a loss on the "sale" of the waterline to the city for $1. While we have found that the waterline was constructed for a business purpose, we cannot find that there was a sale of the waterline by Dockery Stainless Steel Co. Rather, what was involved was the construction of the line in order to benefit the *476 building. Since the line was required to be deeded to the city, no "sale" ever occurred. Under these circumstances, the cost of installing the line should be treated as a capital expenditure under section 263. 3. Adjusted Basis of the Assets Sold and Abandoned and the Fair Market Value of Inventory
Respondent determined that the adjusted basis in the noninventory items sold to Rockingham Steel Co. was $38,860.41 for a total gross profit of $208,139.59 ($244,000 less $38,860.41). Petitioners argue that the total cost to them of the items purchased prior to 1965 but not on the depreciation schedule was $200,000 ($175,000 allocated to those items sold to Rockingham Steel Co. and $25,000 allocated to machinery allegedly abandoned). Although the record is not clear, apparently they argue that the full cost of the items not on the depreciation schedule should be the basis of the items sold and abandoned. Petitioners further contend that the total value of inventory reflected in the sales was $2,000 and not $17,000 as contended by respondent. This would increase the total proceeds from the sale of noninventory goods to Rockingham Steel Co. to $259,000, thereby increasing the capital *477 gain attributable thereto but reducing the ordinary income proceeds from the inventory sale. The total gain recognized by Dockery on the sale of noninventory goods to Rockingham Steel Co. would, therefore, be $54,664.72 ($259,000 less $204,335.28) [9] and the total abandonment loss would be $ 4,525.13 (the $9,525.13 allowed by respondent for those items listed on the depreciation list plus the additional $25,000 for items allegedly abandoned that were not on the list). Finally, petitioners contend that respondent charged them with ordinary income rather than capital gain on the sale of the two items sold for $3,000 to companies other than Rockingham Steel Co. and did not give these assets any basis. However, respondent treated the sale of these items as capital gains in the deficiency notice and although respondent admits that he did not allocate *478 any basis to these two items, respondent contends that the bases were included in the total basis of the items sold to Rockingham Steel Co. Petitioner has not shown otherwise, and we, therefore, hold for respondent on this issue. [10]
A taxpayer is, of course, permitted to reconstruct his expenditures where the failure to produce adequate records is due to destruction from a fire. Cohan v. Commissioner,39 F. 2d 540 (2d Cir. 1930), and section 1.274-5(c)(5), Income Tax Regs. Nonetheless, it is incumbent upon the taxpayer to lay some foundation from which the Court may make a determination.
There is no question that 102 items were sold by Dockery to Rockingham Steel Co. However, petitioners' evidence as to cost is based entirely on unsubstantiated testimony, almost none of which is specific as to time, place, or cost of any particular piece of machinery. *479 Nor have petitioners made any effort to establish how much of this cost should properly have been depreciated thereby reducing the cost basis of the machinery as required under section 1016. Petitioners rely mainly on Cohan v. Commissioner,supra, to support their claim that they are entitled to a greater basis than that allowed by the Commissioner. Petitioners testified that the cost of the machinery sold was approximately $175,000, although they stated that they purchased many of their items at Government surplus and at auction sales. They also conceded that many items were purchased four or five years before the sale, although contended that most were purchased in 1964. The reconstruction of their records was made entirely from their memories; there was no record of any loans they alleged they used to purchase assets, nor is there any indication that they attempted (but failed) to obtain copies of checks they may have used in the purchases or sales records from any of the sellers from whom they purchased the items.
However, we do not believe that respondent's determination of the basis of the assets sold as $38,860.41 was arrived at by any reasonable method since the allowance *480 of $9,525.13 as adjusted basis of the 15 items abandoned and on the depreciation schedule which respondent also allowed as applying to additional items sold bore no relationship at all to the total basis of the noninventory items sold that were not on the depreciation schedule. Nor is there anything in the record from which we may infer that the basis of the items sold but not on the depreciation schedule bore a reasonable relationship to the adjusted basis of the items sold that were reflected on the schedule. Nonetheless, we are convinced that respondent's determination is too low. The total cost of the 26 items sold to Rockingham Steel Co. which were purchased prior to 1965 and listed on the depreciation schedule was $56,903.60 and depreciation attributable thereto was $30,858.32, yielding an adjusted basis of $26,045.28 (and this includes the basis of the two items sold to other companies). After subtracting these 26 items plus the five inventory items and five items purchased after 1965, there remains 66 noninventory items which were sold for which no basis was known. In recognition that the remaining 66 items had some basis, respondent arbitrarily allowed only an additional *481 $9,525.13 for these goods. Petitioners were credible witnesses, and although we cannot give full weight to their unsubstantiated testimony that the purchase cost was $175,000, neither can we believe that assets purchased just a few years prior to their sale for $261,000 had a basis of only $38,860.41, even taking into account depreciation. Additionally, it appears from the record that the type of machinery involved in the sale would not greatly appreciate in value over the years. Under the circumstances, based on the very unsatisfactory record before us, we believe it appropriate to apply the Cohan rule, and we find that Dockery's adjusted basis in the assets sold to Rockingham Steel Co. was $50,000. The record as to the abandoned assets not on the depreciation schedule is even worse. Respondent allowed a $9,525.13 loss for the 15 items on the depreciation schedule which had a remaining basis and which Dockery claimed it abandoned. Petitioners claim they purchased $25,000 worth of equipment which was abandoned but not on the depreciation schedule and for which they were denied a loss. Not only is the record as bare with regard to cost and depreciation (that should have been taken *482 but was not) as is the record of the machinery sold, there is not even a list of the additional items claimed to be abandoned. While the petitioners have provided some unsubstantiated photographs of abandoned equipment, it was never determined which of these machines (if any) were on the depreciation schedule and which (if any) were not. Thus, petitioners have not shown they actually abandoned the additional machinery claimed abandoned, nor have they shown they purchased any specific item which was abandoned. On such evidence, we cannot find petitioners are entitled to any additional basis for abandoned machinery. Petitioners claim they had only $2,000 worth of inventory on hand when they sold the assets to Rockingham Steel Co. The Commissioner determined five of the items sold should be classified as inventory. Petitioners apparently concede that those five items should have been so classified, but contend their value was only $2,000. The Commissioner arrived at a $17,000 valuation by using the figures on the bill of sale, placed there by Rockingham Steel Co. in valuing those items for its own purposes as purchaser. Since that amount was not achieved through arm's-length bargaining *483 between petitioners and Rockingham Steel Co., it is not binding on either respondent or petitioners. Nonetheless, the only testimony petitioners offered to refute the Commissioner's valuation was a vague and unsubstantiated statement that they had approximately $2,000 worth of supplies on hand at the time of sale. This alone will not satisfy petitioners' burden of proof. Respondent, however, has given these items a zero cost basis. Since we are not concerned with the effects of section 1016 on the basis of these items, as inventoried goods are not subject to depreciation, section 1.167(a)-2, Income Tax Regs., we need discern only the cost of the inventory to arrive at its basis. Based on the evidence before us, and using our best judgment, we determine that the inventory had a basis of $2,000. Therefore, Dockery Stainless Steel Co. received ordinary income of $15,000 from the sale of its inventory in 1966. Decisions will be entered under Rule 155. Footnotes
1. Upon joint motion of the parties, these cases were consolidated for trial, briefing and opinion.↩
2. Although the parties stipulated that Emily operated three towel shops in 1966, 1967 and 1968, she testified that she had two in 1966 and four in 1967 and 1968 in Myrtle Beach.↩
3. Emily testified that she and her husband each spent 130 days in 1967 and 154 days in 1968 at Myrtle Beach. She then used a $22.85 per diem allowance for both John and herself in 1967 and a $22.88 per diem allowance in 1968 to arrive at $5,966 in 1967 (2 X 130 days X $22.85) and $7,048 in 1968 (2 X 154 days X $22.88). Actually, Emily used 261 days in her computation for 1967 but she does not show how she arrives at this. Moreover, it is not clear whether Emily included in her costs any additional amounts which might have been expended for her children or simply conceded that she was not entitled to additional deductions for them.
4. Respondent "arrived" at this amount by incorporating into his calculation of basis for these noninventory goods sold the cost and depreciation of the items abandoned; thus, the additional basis for these items is the same as the basis respondent allowed for the abandoned machinery listed in the depreciation schedule. ↩
5. Rockingham Steel Co. specifically allocated the $261,000 to the various items purchased, $17,000 of which was allocated to the five items determined by respondent to be inventory. This figure was used by respondent to determine the value of the inventory. Respondent apparently permitted zero cost basis because he felt he had not included certain items which were inventory in the inventory schedule, thereby permitting capital gain treatment for them.↩
6. All statutory references are to the Internal Revenue Code of 1954 in effect during the taxable years in issue.↩
7. In Scheffres v. Commissioner,T.C. Memo. 1969-41, the Court, dealing with the question of what constitutes a "contribution" under section 170 for a partnership, noted that "[the] law with regard to gratuitous contributions to charitable organizations * * * is not free from doubt." The Court held there that section 170↩ would apply unless the conveyance was compelled by law or enforceable contract or unless the grantors received a quid pro quo in the form of a special economic benefit.
8. Often, the business would be entitled to a deduction under section 162 in such instances. See sections 1.170-1(c)(1) and 1.170A-1(c)(5), Income Tax Regs. However, the donation in question may otherwise be a capital expenditure under section 263↩ and nondeductible.
9. This figure is arrived at by adding the $26,045.28 basis allowed by respondent for the 26 noninventory items listed on the depreciation schedule and the $175,000 cost allegedly incurred by Dockery for the remaining noninventory items purchased prior to 1965 plus the $3,290 basis allowed by respondent for items purchased in 1965 and 1966.↩
10. The deficiency notice claims there was a $15,080.67 gain representing section 1245 depreciation recapture on certain noninventory items as a result of the sale. This was disputed by petitioners after receiving the notice of deficiency but they did not raise this at trial or on brief. We, therefore, hold for respondent on this issue.↩